Filed 6/16/15  P. v. Chandra CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br>AARON CHANDRA,<br><br>        Defendant and Appellant. | A138401<br><br>(Alameda County<br>Super. Ct. No. CH50444) |
| In re AARON CHANDRA<br>        on Habeas Corpus. | A143741 |

Defendant Aaron Chandra appeals from a judgment convicting him of second degree murder and possession of marijuana for sale and sentencing him to a term of 40 years to life in prison. On appeal, he argues that an instructional error and two evidentiary errors require reversal of his convictions. He also argues in his direct appeal, and in a petition for habeas corpus, that his trial attorney provided ineffective assistance and that the prosecutor engaged in pervasive and prejudicial misconduct.[1] We shall affirm the judgment and deny defendant's writ petition.

---

[1] We ordered the petition consolidated with the appeal, and deferred deciding whether to issue an order to show cause, whether to allow further discovery, and whether to order an evidentiary hearing.

1

**Factual and Procedural History**

Defendant was charged with one count of murder (Pen. Code,[2] § 187, subd. (a)) and one count of possession of marijuana for sale (Health & Saf. Code, § 11359). The information also alleged several firearm enhancements (§ 12022.5, subd. (a), § 12022.7, subd. (a), § 12022.53, subds. (b), (d), (g)).

The following evidence was presented at trial:

*The Prosecution's Case*

On August 29, 2010, Samir Hudieb arranged for the victim, Osana Saga, to purchase from defendant four ounces of marijuana for $800. About 2:00 p.m., Saga, Hudieb and a third person, Chris Faasisila, drove to defendant's house to make the purchase. Saga gave Hudieb the money to purchase the marijuana and Hudieb completed the purchase while the others waited in the car.

After they drove away from defendant's house, Saga, Faasisila, and Hudieb weighed the marijuana. Saga, believing that defendant had shorted him an eighth of an ounce, told Hudieb that he wanted either the missing eighth or a full refund and he would return all of the marijuana that he purchased to defendant. When Hudieb called defendant and told him that they were missing an eighth of an ounce, defendant denied there was a shortage. Hudieb told defendant that he was coming back to his house to show him the shortage.

When they returned, Saga and Hudieb entered defendant's garage while Faasisila waited in the car. Defendant was in the garage with a friend. Hudieb told defendant that the marijuana was short and that he could weigh the marijuana himself. Defendant insisted that it was not short. Saga told defendant that he could give him the missing marijuana or a refund. When defendant pulled out a $20 bill to give to Saga, Saga became angry and slapped defendant. Then he and defendant "[held] onto each other" and they "push[ed] off each other" going in opposite directions. Defendant then reached his arm

---

[2] All statutory references are to the Penal Code unless otherwise noted.

up facing Saga and Hudieb heard a loud bang. Hudieb estimated that defendant was standing about seven or eight feet away from Saga when defendant fired the shot.

Faasisila, who had stayed in the car at first, went to the garage when he heard the argument. From the doorway of the garage, he saw Saga arguing with defendant. After the shooting, he, Saga and Hudieb ran out of the garage. On his way out Faasisila grabbed a cell phone. Saga collapsed on the sidewalk and was transported by ambulance to the hospital, where he later died.

Following his arrest, defendant told the police, "They just rushed into my house and told me to give them everything. One of the guys punched me in the face and then told the other guy to give him the gun. I went and got my gun. Man, I'm scared. Am I going to jail?"After the incident, defendant called Hudieb and said that he shot Saga because Saga "was trippin."

Almost two years after the incident, in May of 2012, Hudieb was arrested following an alleged attack on defendant's brother. Hudieb denied the attack and the case against Hudieb was eventually dismissed. In January 2013, about a week and a half before his testimony at defendant's trial, a car belonging to Hudieb's girlfriend was spray-painted with the following: "Fuck Samir," "You will pay," "Homo boy snitch," "Rat," and "You will die." Hudieb testified that he was "uncomfortable" testifying but he was not concerned for his safety. He was not scared of defendant and did not fear retribution. He admitted that he had entered a use-immunity agreement with the prosecutor under which the prosecutor promised not to prosecute him for arranging the drug deal between defendant and Saga in exchange for Hudieb's promise to tell the truth at defendant's trial.

The police detective who interviewed defendant shortly after his arrest observed a scratch on his left ear, but no other visible injuries. Defendant complained of soreness to the left of his face but declined the officer's offer to take him to a hospital.

*The Defense Case*

Defendant testified that he had been selling marijuana for approximately seven months prior to the shooting incident and admitted selling Hudieb four ounces of

3

marijuana on the day of the shooting. He claimed that he did not make a mistake when he weighed the marijuana. When Hudieb called to say that the marijuana was short, he heard someone in the background say "Tell him not to fuck with my money. I got a cannon." Defendant told Hudieb to come to his house so they could resolve the dispute. He felt threatened and went upstairs to retrieve his gun. Hudieb entered the garage first, then Saga and Faasisila walked into the garage. Saga and Faasisila were big and defendant noticed there was something shiny in Saga's belt and believed it was a gun. Saga asked why the marijuana was short and told defendant to give him the money, then immediately punched him in the face. When defendant attempted to offer Saga a little more than $20, Saga said, "What the fuck is this? I need everything you got." Then Saga started punching defendant again. Defendant did not believe Saga was going to stop hitting him or that he could run away. Defendant thought Saga was going to knock him unconscious or kill him. Saga's last punch knocked defendant back against the wall. When Saga came at him again with his fist back, defendant pulled out his gun and fired three times.

Defendant admitted that he originally lied to the police when he told them that he shot Saga because he saw Saga pulling a gun from his waistband. He also admitted that he called his brother from jail and told his brother to make sure his friend, Huan Nguyen, who was present during the shooting, knew to tell the police that Saga had a gun sticking out of the right side of his waistband. Defendant acknowledged that his intent was to have Huan corroborate the lie he had told the police. Finally, he admitted that he had researched the law of homicide while in jail.

Defendant testified he did not "think" that he tried to prevent Hudieb from testifying, but also claimed that would not be something he would remember. Later, however, he denied threatening Hudieb or directing anyone to spray paint the car of Hudieb's girlfriend. He did not know if his brother or any other of his associates had spray painted the car.

Huan Nguyen testified that he was in the garage at the time of the shooting. He testified that Hudieb and Saga entered the garage within seconds of each other. Faasisila came into the garage shortly after Saga, and he stood in the doorway. Saga told defendant

that it was not "cool" to short him. When defendant offered Saga at least a $20 bill, Saga got mad and punched defendant. Defendant and Saga fell out of Huan's view, but he heard a "ruckus" for about 10 or 15 seconds and thought Saga was still hitting defendant. Defendant lost his balance and did not appear capable of fighting back. Then he heard gunshots, and Hudieb, Faasisila and Saga ran out of the garage. He denied that defendant's brother called him to tell him to lie to police about the victim having a gun.

*Verdict and Sentencing*

The jury found defendant guilty of second degree murder and possession of marijuana for sale. The jury also found true all of the firearm enhancements. Defendant was sentenced to a term of 40 years to life and filed a timely notice of appeal.

**Discussion**

1.  *The court did not err in failing to instruct the jury on the evidentiary presumption found in the Home Protection Bill of Rights.*

"Section 198.5, enacted in 1984 and entitled the 'Home Protection Bill of Rights,' creates a rebuttable presumption that a residential occupant has a reasonable fear of death or great bodily injury when he or she uses deadly force against an unlawful and forcible intruder into the residence. [Citations.] For section 198.5 to apply, four elements must be met. There must be an unlawful and forcible entry into a residence; the entry must be by someone who is not a member of the family or the household; the residential occupant must have used 'deadly' force (as defined in § 198.5) against the victim within the residence; and finally, the residential occupant must have had knowledge of the unlawful and forcible entry." (*People v. Brown* (1992) 6 Cal.App.4th 1489, 1494-1495.) Defendant contends the court erred in failing to instruct the jury with CALCRIM No. 3477, which explains the statutory presumption. [3]

---

[3] CALCRIM No. 3477 reads: "The law presumes that the defendant reasonably feared imminent death or great bodily injury to (himself/herself) [, or to a member of (his/her) family or household,] if: [¶] 1. An intruder unlawfully and forcibly (entered/ [or] was entering) the defendant's home; [¶] 2. The defendant knew [or reasonably believed] that an intruder unlawfully and forcibly (entered/ [or] was entering) the defendant's home; [¶] 3. The intruder was not a member of the defendant's household or family; AND

5

Initially, the Attorney General argues that any instructional error was invited. At trial, defense counsel requested the court to instruct with CALCRIM No. 3477. The court indicated, however, that CALCRIM No. 506 (justifiable homicide: defending against harm to person within home or property) was more appropriate than CALCRIM No. 3477.[4] Following discussions in chambers, the court explained on the record that "we had some fairly lengthy discussions with respect to the question of self-defense as it relates to the instructions that specifically deal with defending property or a home versus an individual exercising the right of self-defense and I think we agreed that the facts of the case as they came in do not lend themselves to the instructions that have to do with the defense of a home or property." Both the prosecutor and defense counsel agreed with the court's statement and defense counsel added, "I agree with all the instructions that will be given. I have . . . no objection to them. I have not requested any instructions that the court will not give. [¶] . . . [¶] To the extent that that's at odds with what I filed with the court, I would withdraw my request for any instructions that will not be given." The court concluded, "I'll give 506, which is defending against harm to a person within home or property, which is more appropriate as opposed to . . . 3477, which has to do with presumptions that applies when there's forcible entry. And I think we agreed that while there was entry into a home, it was not forcible." Defendant disputes that the instructional error was invited and argues that any waiver by counsel would amount to ineffective assistance of counsel. We need not determine whether there was invited error or a waiver, however, because it is clear that there is no substantial evidence that Saga "unlawfully and forcibly" entered defendant's garage sufficient to support the omitted instruction.

[¶] 4. The defendant used force intended to or likely to cause death or great bodily injury to the intruder inside the home. [¶] . . . [¶] The People have the burden of overcoming this presumption. This means that the People must prove that the defendant did not have a reasonable fear of imminent death or injury to (himself/herself)[, or to a member of his or her family or household,] when (he/she) used force against the intruder. If the People have not met this burden, you must find the defendant reasonably feared death or injury to (himself/herself)[, or to a member of his or her family or household]."

[4] The text of CALCRIM No. 506, which the court did give, is quoted at pages 15-16, *infra.*

As defendant notes, section 198.5 does not define unlawful or forcible entry. However, other statutory provisions do. Unlawful entry is defined in section 602.5, subdivision (a) as the entry of a "noncommercial dwelling house . . . without consent of the owner." The record does not support the conclusion that Saga entered defendant's garage without consent. Defendant testified that he told Hudieb to come to his house to resolve the discrepancy and that when Hudieb "called me and told me that he was outside . . . I told him to come to the back." Although defendant testified that he did not invite Saga into his home, he clearly invited Hudieb into the garage. He knew that Hudieb was with Saga and never indicated that Saga was not to enter the property with Hudieb.

There is also no evidence that Saga's entry into the garage was forcible. Code of Civil Procedure section 1159 provides that "Every person is guilty of a forcible entry who . . . [¶] 1. By breaking open doors, windows, or other parts of a house, or by any kind of violence or circumstance of terror enters upon or into any real property. . . ." (See also § 418 [forcible entry, as defined by section 1159, is a misdemeanor].) Saga did not use violence or threats to enter the garage.

Defendant's reliance on *People v. Brown, supra*, 6 Cal.App.4th at pages 1495-1496 for the proposition that "[a] forcible entry . . . is the same as an unlawful entry for purposes of residential burglary" is entirely misplaced. In *Brown* there was no dispute that the entry was forcible. The evidence showed that "the victim entered defendant's front porch and advanced toward defendant with a hammer raised back at shoulder-height." (*Id*. at p. 1491.) The question on appeal was whether the homeowner's unenclosed front porch was part of his "residence" for purposes of section 198.5. To answer that question, the court looked to legal authority regarding what constitutes a residence for purposes of a burglary. Because "unlawful entry" is defined by the Penal Code, we need not rely on analogy to determine its meaning.

Accordingly, we find no instructional error.

2.      *There was no error in the admission of evidence of threats made against Hudieb prior to trial.*

As set forth above, Hudieb testified that threats against him were painted on his girlfriend's car just prior to trial. In closing argument, the prosecutor argued that if defendant "tried to . . . discourage someone from testifying against him, this may show that he was aware of his guilt." The prosecutor detailed the threats made against Hudieb and reminded the jury that when defendant was asked whether he tried to prevent Hudieb from testifying, his initial response was "I don't think so" and then that he "wouldn't remember that."[5]

Defendant acknowledges that his attorney did not object to the introduction of this evidence but contends that the admission of the testimony was "plain error" and that his attorney performed inadequately in failing to object. He argues that because the identity of the persons who spray painted the threats was unknown, the evidence should have been excluded.

A defendant's " ' "[e]fforts to suppress testimony against himself indicate a consciousness of guilt on the part of a defendant, and evidence thereof is admissible against him. [Citation.] Generally, evidence of the attempt of third persons to suppress testimony is inadmissible against a defendant where the effort did not occur in his presence. [Citation.] However, if the defendant has authorized the attempt of the third person to suppress testimony, evidence of such conduct is admissible against the defendant." ' " (*People v. Hannon* (1977) 19 Cal.3d 588, 599, disapproved on another ground by *People v. Martinez* (2000) 22 Cal.4th 750, 762-763.) "Whether or not any given set of facts may constitute suppression or attempted suppression of evidence from which a trier of fact can infer a consciousness of guilt on the part of a defendant is a question of law. Thus in order for a jury to be instructed that it can infer a consciousness of guilt from suppression of adverse evidence by a defendant, there must be some

_____

[5] The jury was instructed that "[i]f the defendant tried to hide evidence, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you the decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself."

8

evidence in the record which, if believed by the jury, will sufficiently support the suggested inference." (*Hannon,* p. 597.)

Here, contrary to defendant's argument, there is sufficient evidence connecting defendant to the threats against Hudieb to support admission of the evidence and the consciousness-of-guilt instruction. The timing of the threats, which were made as jury selection was starting, supports the inference that the threats were intended to keep Hudieb from testifying against defendant. Defendant's initial testimony regarding whether he was involved in making the threats was ambiguous and evasive. To the extent he later attempted to deny involvement, his credibility was largely undermined by his acknowledgment that he had instructed his brother to persuade Huan to lie about seeing Saga with a gun. Moreover, this acknowledgement is itself evidence that he was involved in efforts to alter the evidence, supporting the inference that he bore some responsibility for the threats to Hudieb. Because the evidence was properly admitted, counsel cannot be faulted for failing to object.[6]

3.      *There was no error in the admission of testimony that defendant had studied the law of homicide while in jail.*

During his opening statement, defense counsel stated that defendant acted in self-defense and explained that defendant initially lied to the detective about seeing Saga reaching for a gun, because he "panicked" and he "didn't know the law of homicide." During direct examination, defendant admitted that he lied to the detective when he told him that he saw Saga reach for a gun from his waistband during the altercation. In response to the prosecutor's questions on cross-examination, defendant acknowledged that since being in jail he had researched the law of homicide and that he now knew the different standards applicable in a homicide case. When asked whether that was why he had changed his story, defendant said "No. I was just trying to tell exactly what had happened." The prosecution relied on this testimony in closing argument: "I asked

---

[6] We find no merit in defendant's contention that the prosecutor committed misconduct by referring in closing argument to defendant's evasive denials regarding the threats but failing to mention defendant's "explicit denials shortly thereafter." The prosecutor had no obligation to highlight testimony that he did not find credible or persuasive.

9

defendant on the witness stand, 'So when you gave your statement to Detective Coffey and you said the victim was going for a gun, you did not know the law of homicide, right?' 'Right, yes.' 'And since then, you've been studying the law of homicide, haven't you?' 'Yes.' 'You've been looking at the homicide books?' 'Yes.' [¶] Here's why. This is the defense he's going for. This is why he changed his story. It's called imperfect self-defense. And basically if a defendant actually believes that he's in danger, then he can protect himself." In his closing argument, defense counsel argued that defendant's "reaction [to the shooting] was obviously to panic and do anything he could to avoid prosecution and convince people it was a justified shooting. He hid the gun in obvious panic. He told the officers at the scene that . . . he heard Osana say to [Faasisila], 'Get the gun.' Later, he told the police he saw Osana reaching for the gun. [¶] I mean, these are just wildly desperate attempts by him to say what he thinks he needs to say to make it a justified shooting. And if you think . . . he knew the law of homicide, then you're wrong. If you think he knows it now, you're also wrong. If you think he had the mental acumen to listen to the law and read it and craft a defense, then you misjudged him on the stand because he doesn't have that mental acumen. No offense intended to [defendant]. But he obviously panicked." Defendant acknowledges that no objection was lodged to the prosecutor's questions but contends the trial court erred by allowing the prosecutor to question defendant about his study of the law and that his attorney was ineffective in failing to object.

There was no error in permitting the prosecutor's questions or deficiency in counsel's failure to object. Defense counsel clearly had a tactical reason for telling the jury that defendant did not know the law of homicide at the time of his arrest. It was part of his explanation for why defendant lied to the police following his arrest—that because defendant was unfamiliar with the law, he did not know that the truth of what had actually happened was enough to support a defense to the shooting. The prosecution's follow up questions were perfectly reasonable under the circumstances and no objection was warranted. Contrary to defendant's argument, a juror would not reasonably have

understood the prosecution's questions, nor his subsequent closing argument, as implying that defendant's attorney, rather than the defendant, was presenting a false defense.

4.      *The prosecutor did not commit prejudicial misconduct.*

The standards governing a claim for prosecutorial misconduct are well established. "A prosecutor's conduct violates the federal Constitution when it infects the trial with such unfairness as to make the resulting conviction a denial of due process. Conduct by a prosecutor that does not rise to this level nevertheless violates California law if it involves the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury. [Citations.] To preserve a prosecutorial misconduct claim for appeal, the defendant ' "must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety" ' unless doing so would be futile or an admonition would not cure the harm." (*People v. Whalen* (2013) 56 Cal.4th 1, 52.)

Between his direct appeal and his habeas petition, defendant identifies 23 separate instances of purported prosecutorial misconduct in the trial court proceedings. Defendant acknowledges that his trial attorney did not object to any of the asserted misconduct but argues that the misconduct was so "pervasive and intentional" that an objection was not necessary to preserve the issue on appeal, or alternatively, that counsel was ineffective in failing to object. Despite the fact that defendant has forfeited his prosecutorial misconduct claims by failing to object, we shall nonetheless exercise our discretion to review them on their merits. In doing so, we are mindful that " '[a] defendant's conviction will not be reversed for prosecutorial misconduct . . . unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.' " (*People v. Tully* (2012) 54 Cal.4th 952, 1010.)[7]

---

[7] Defendant asserts that the prosecutor in this case has been the subject of two previous unpublished opinions finding misconduct and asks that we take judicial notice of those cases. (See *People v. Hill* (1998) 17 Cal.4th 800, 847.) There is little similarity between the alleged misconduct in the present case and the facts in the prior unpublished decisions and we therefore deny the rest for judicial notice as irrelevant.

A. *The prosecutor did not improperly attack the integrity of defense counsel.*

Defendant contends the prosecutor committed misconduct by accusing defense counsel of reserving his opening statement as part of a plan to suppress testimony and suborn perjury. In closing argument, the prosecutor stated, "Remember when Mr. Bequette [defense counsel] stood up before you, he had reserved his opening statement, which a defense has a right to do. It's a very important thing to do if you don't know what the prosecution is going to be able to prove. [¶] If you don't know if the prosecution is going to be able to get Samir [Hudieb] in here. If you don't know whether Huan can lie for the defendant. So you can sit back and you can wait to see what can the prosecutor prove. Will Samir get scared enough to not come in? [¶] And so the defense elected to reserve their opening statement and wait."

Contrary to defendant's argument, a reasonable juror was not likely to understand the quoted statement as implying that defense counsel had a "plot to prevent [Hudieb] from testifying and to get Huan to commit perjury." Nor can the prosecutor's comments be reasonably understood as an attack on the integrity of defense counsel. The prosecutor was identifying the reliability issues of the witnesses and highlighting defense counsel's potential strategy for managing these credibility concerns. (See *People v. Medina* (1995) 11 Cal.4th 694, 759 [rejecting claim that the prosecutor demeaned defense counsel's integrity by observing that " 'any experienced defense attorney can twist a little, poke a little, try to draw some speculation, try to get you to buy something' "].)

The record does not support defendant's claim that the prosecutor's statements regarding defense counsel's strategy were false or misleading. Defendant argues that "defense counsel could not have decided to reserve his opening statement in hopes that either Samir would not testify or that Huan would testify in a certain way." He notes that before the prosecutor gave his opening statement, defense counsel knew that Samir and his attorney were present in court and was on notice that Samir would testify pursuant to the grant of immunity. Similarly, defense counsel could not have reserved his opening statement in hopes that Huan would "lie" because Huan was a defense witness who did not testify as part of the prosecution's case. What defendant "knew" about the testimony

12

of these witnesses does not change the fact that there was still considerable uncertainty regarding their actual testimony. The prosecution's suggestion that the defense may have had a tactical reason to delay opening argument was not unreasonable or unfounded under the circumstances.

      B.      *Any error in the prosecutor's statement of the law was not prejudicial.*

There is no dispute that the jury was properly instructed on the applicable law of homicide. The jury was instructed, pursuant to CALCRIM No. 500: "Homicide is the killing of one human being by another. Murder and manslaughter are types of homicide. The defendant is charged with murder and manslaughter. Manslaughter is a lesser offense to murder. [¶] A homicide can be lawful or unlawful. If a person kills with a legally valid excuse or justification, the killing is lawful and he or she has not committed a crime. If there is no legally valid excuse or justification, the killing is unlawful and, depending on the circumstances, the person is guilty of either murder or manslaughter. You must decide whether the killing in this case was unlawful and, if so, what specific crime was committed." The jury was instructed pursuant to CALCRIM No. 520: "To prove that the defendant is guilty of [murder], the People must prove that: [¶] 1. The defendant committed an act that caused the death of another person; [¶] AND [¶] 2. When the defendant acted, he had a state of mind called malice aforethought; [¶] AND [¶] 3. He killed without lawful excuse or justification." The jury was further instructed that "There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder. [¶] The defendant acted with *express malice* if he unlawfully intended to kill. The defendant acted with *implied malice* if: [¶] 1. He intentionally committed an act; [¶] 2. The natural and probable consequences of the act were dangerous to human life; [¶] 3. At the time he acted, he knew his act was dangerous to human life; [¶] AND [¶] 4. He deliberately acted with conscious disregard for human life. . . ."

The jury was given two instructions regarding voluntary manslaughter. Pursuant to CALCRIM No. 570, the jury was instructed in relevant part, "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed

13

someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] 1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; [¶] AND [¶] 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment. [¶] Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection. [¶] In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time. [¶] It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment." The jury was also instructed, pursuant to CALCRIM No. 571, as follows: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense. [¶] If you conclude the defendant acted in complete self-defense, his action was lawful and you must find him not guilty of any crime. The difference between complete self-defense and imperfect self-defense depends on whether the defendant's belief in the need to use deadly force was reasonable. [¶] The defendant acted in imperfect self-defense if: [¶] 1. The defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury; [¶] AND [¶] 2. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; [¶] BUT [¶] 3. At least one of those beliefs was unreasonable. [¶] Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. [¶] In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant. [¶] Great bodily injury

14

means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm. . . ."

Finally, with respect to whether defendant acted with a lawful excuse or justification, the jury was instructed pursuant to CALCRIM No. 505 as follows: "The defendant is not guilty of murder or manslaughter if he was justified in killing someone in self-defense. The defendant acted in lawful self-defense if: [¶] 1. The defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury or of being robbed; [¶] 2. The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger; [¶] AND [¶] 3. The defendant used no more force than was reasonably necessary to defend against that danger." The instruction explains further, "Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of death or great bodily injury to himself. Defendant's belief must have been reasonable and he must have acted only because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the killing was not justified. [¶] When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed. [¶] . . . [¶] A defendant is not required to retreat. He or she is entitled to stand his or her ground and defend himself or herself and, if reasonably necessary, to pursue an assailant until the danger of death or great bodily injury has passed. This is so even if safety could have been achieved by retreating. [¶] Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm."

The jury was also instructed, pursuant to CALCRIM No. 506 that "The defendant is not guilty of murder or manslaughter if he killed to defend himself in the defendant's home. Such a killing is justified, and therefore not unlawful if: [¶] 1. The defendant

15

reasonably believed that he was defending a home against Osana Saga who entered that home intending to commit an act of violence against Aaron Chandra; [¶] 2. The defendant reasonably believed that the danger was imminent; [¶] 3. The defendant reasonably believed that the use of deadly force was necessary to defend against the danger; [¶] AND [¶] 4. The defendant used no more force than was reasonably necessary to defend against the danger."

Defendant argues that despite the correct instructions, during closing argument the prosecutor repeatedly and prejudicially misstated the law. Defendant contends that the prosecutor misstated the law regarding second degree murder by arguing that when two people are engaged in a fist fight and one pulls out a gun and kills the other or when a drug dealer shoots and kills an unarmed person, it is second degree murder.[8] Defendant's characterization of the prosecutor's argument as a misstatement of the law is highly questionable. The prosecutor was not stating the law but rather arguing about its application to the facts in this case. In the first instance, the prosecutor argued that when one pulls out a gun during a fight, as compared to a baseball bat, it evidences an intent to kill and when one intentionally pulls the trigger of the gun, as compared to an accidental discharge, it evidences a conscious disregard for human life. The second alleged misstatement was merely a summary of the prosecutor's closing argument. Given the lengthy instructions on the applicable law, neither comment was likely to be understood as a complete statement of the law.

---

[8] Specifically, the prosecutor argued: "It's a case of second degree murder because basically he pulled out a gun during a fist fight. [¶] It happens all the time. It happens on BART. It happens in school yards. It happens everywhere. People get in fights. Road rage cases, people get beat up. . . . [¶] When one person pulls out a gun, when one person pulls out a knife and elevates it from a fist fight, no matter how bad, it's murder. It's not first degree murder, but it's second degree murder." The prosecutor also argued that defendant should be treated "the same as any other drug dealer who pulls out a gun and shoots and kills an unarmed person, even if provoked, even if hit, even if slapped, even if pushed. In the State of California, that's second degree murder. And I ask that you return that verdict accordingly."

16

Defendant also argues that the prosecutor committed misconduct in arguing, "When somebody is convicted of voluntary manslaughter, they're getting away with murder." There was no prejudice in the prosecution's characterization of voluntary manslaughter as "getting away with murder." As noted, the jury was properly instructed that "[a] killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone" either in the heat or passion/sudden quarrel or with imperfect self-defense. The prosecutor's comment plainly reflected no more than his contention of how the evidence in this case should be viewed While perhaps uncalled for, the statement could not reasonably have been understood as a statement of the law and did not constitute prejudicial misconduct.

Next, defendant argues that the prosecutor committed misconduct in arguing that heat-of-passion manslaughter requires that a reasonable person would have acted the same way, while equating "reasonable person" with "juror," and arguing that a jury member would have had to find that he or she would have shot a customer over a drug deal. The prosecutor explained that to find defendant guilty of voluntary manslaughter, the jury would have to find that defendant acted "under intense emotion that would obscure reason and judgment, and an average person would have acted the same way. So in other words, when we talk about an average person or a reasonable person, we're talking about you. Just an average member of the community, which all of you are. They're in various instructions. There's what's called the reasonable person standard or the average person standard, that's you." The prosecutor argued that heat-of-passion voluntary manslaughter was not applicable in this case because defendant "brought that gun into the garage knowing he would use it. . . . He's a drug dealer. He knows there are disputes over drug dealing. This is not an unexpected situation for a drug dealer to have a dispute with a customer. [¶] So you don't have the situation where he would never have foreseen it. All of a sudden he's in the middle of something he could have just never fathomed. . . . [¶] . . . And that's why I'm confident that you, as an average person, would not have been an armed drug dealer, shooting a customer over a dispute because the customer smacked you around enough to cause a scratch."

17

Defendant's objection to this argument is two-fold. First, he argues that the prosecutor improperly encouraged jurors to impose their own subjective judgment rather than applying an objective standard. In *People v. Mendoza* (2007) 42 Cal.4th 686, 703, the court explained, "The 'reasonable person' is a hypothetical individual who is intended to represent a sort of 'average' citizen. Therefore, it is one thing to refer to the jurors as members of society in the course of explaining the reasonable person standard as a means of determining whether a killing was caused by an event or situation that probably would cause a reasonable person to lose self-control and kill. Accordingly, it was not misconduct for the prosecutor to tell the jury 'And who is the ordinarily reasonable person? You folks are.' It is another thing, however, to imply that the jurors, as individuals, can substitute their own subjective standard of behavior for that of the objective, reasonable person. Statements such as, 'Would any of you do what he did here and say that's reasonable? Would any of you do that? No. Would any of you put a gun to people's heads? Would any of you do what he did here?' appear to encourage jurors to impose their own subjective judgment in place of applying an objective standard. It is here that the prosecutor went too far, committing misconduct." Viewing the prosecutor's statements in this case in context, we do not believe his argument can reasonably be understood to encourage subjective reasoning. The prosecutor spoke repeatedly of what an "average person" would do under the circumstances, and asked, in effect, what would "you, *as an average person*," do? This was hardly an invitation for the jurors to apply their own individual standards.

Defendant also notes, correctly, that the argument incorrectly states the law insofar as it suggests that to find voluntary manslaughter the law requires a showing that an average person would have shot and killed the victim under the circumstances shown by the evidence. However, all that is required is that an average person in the same situation would have acted "rashly and without due deliberation." (CALCRIM No. 570; *People v. Najera* (2006) 138 Cal.App.4th 212, 223 ["The focus is on the provocation—the surrounding circumstances—and whether it was sufficient to cause a reasonable person to act rashly. How the killer responded to the provocation and the reasonableness of the

18

response is not relevant to sudden quarrel or heat of passion."].) The misstatement appears harmless, however, when considered in the context of the instructions that were given and the remainder of the prosecutor's argument. The clear import of the argument quoted above is that a reasonable person would not have acted rashly and without due deliberation "because [a] customer smacked you around enough to cause a scratch."

Defendant also argues that the prosecutor committed misconduct in arguing that heat-of-passion manslaughter requires provocation as extreme as the person being pummeled on the ground and just barely able to draw gun and fire it. As defendant notes, the prosecutor argued that "this is not a situation where he's on the ground being pummeled, his head's hitting the pavement, he just reaches for his [gun] and he's barely able to get it out and fire it." The prosecutor, however, was not discussing the sufficiency of the provocation when this comment was made. Rather, the preceding phrase makes clear that the argument was directed to whether defendant was acting irrationally or with due deliberation and reflection when he fired the gun.[9] The prosecutor argued that the fact that defendant could stand with his arm fully extended before firing was inconsistent with rash, intense emotion. There was no misconduct in making this argument.

Defendant also argues that the prosecutor committed misconduct in arguing that self defense requires that defendant sustain great bodily injury such as a concussion or broken bones. As set forth fully above, both forms of self defense required findings by the jury that the defendant believed that he was in imminent danger of being killed or suffering great bodily injury and that the immediate use of deadly force was necessary to defend against that danger. The instructions explained that great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm. The prosecutor argued that "[g]reat bodily injury is you go to the hospital, you have to be sent to the hospital. Anything less than that is moderate harm.

---

[9] The full sentence reads, "And we know when he fired — and again this goes to acting irrationally and [with] intense emotion — this is not a situation where he's on the ground being pummeled, his head's hitting the pavement, he just reaches for his [gun] and he's barely able to get it out and fire it."

[¶] So if this was a fight and he had gotten a gash on his forehead with stitches, that would be moderate harm. Even a broken nose that could be reset, that would likely be moderate harm. Certainly scratches and bruises are minor. [¶] But something that was substantial, that was significant, if he got a major concussion and you have gashes all over, you know, broken bones, then that would be a significant or serious injury that would send him to the hospital. That's what great bodily injury requires."

The prosecutor's comments did overstate the definition of great bodily injury, but read in context they do not amount to prejudicial misconduct. The prosecutor's comments were prefaced with the statement that to find that defendant was acting in imperfect self-defense, the jury must find that he actually believed he was in imminent danger of death or great bodily injury. The prosecutor suggested that the jury could look to the injuries suffered by defendant, including a scratch and some abrasions to one side of his face, to help determine whether he actually believed he was in imminent danger of death or great bodily injury and whether deadly force was necessary at that moment. Immediately following his statements quoted above, the prosecutor asked "So what is his actual belief?" The prosecutor argued that to determine defendant's beliefs, the jury should consider defendant's statements at the time of his arrest that Saga "had a gun too, which made me pull mine out. I wouldn't have pulled it out if he was to beat me up" and that "I'm not gonna do nothing for him beating me up though. Once he reaches for that gun, I'm pulling mine out and he reached for it and that's when I pulled mine out." Relying on these statements, the prosecutor argued, "So his actual belief was . . . he knew he didn't have to shoot the victim. He knew it. I'm sure he was a little bit scared, but he was also pissed." Contrary to defendant's suggestion, the prosecution's comments did not require defendant to "show that he feared a specific type of injury to be entitled to the defense." The point the prosecutor was making was that defendant did not believe he was about to suffer injuries from "getting beaten up" that could be avoided only by the use of deadly force.

Defendant also argues that the prosecutor committed misconduct in arguing that if Saga had broken into defendant's home, there would have been different instructions and

20

that self defense against forcible entry means you have to be asleep and someone breaks into your home at night. The prosecutor's argument in this regard was relatively limited. Before discussing the instructions given on self defense in one's home or property, he explained, "Before I go through this instruction, if you think the standard here is really high for a homeowner, understand that if this had been a situation where somebody had forcefully broke into his home, it would be a totally different instruction. So this was not a situation where, you know, you're asleep at night and somebody breaks into your home. You'd have an entirely different set of instructions, a totally different standard." We do not believe, as defendant suggests, that a reasonable juror "could have inferred from this argument that the judge thought petitioner had no right to self defense under the facts presented."

Finally, defendant argues that the prosecutor misstated the law of robbery in his rebuttal argument. The allegedly objectionable part of the prosecutor's argument is as follows: "There's no evidence of robbery here, even by [defendant's] friend Huan. . . . [¶] Huan admitted when I was asking him that what he originally told the police was true, which is the victim didn't come in until 30 seconds to a minute after Samir. And then when Chris comes in, everything's already started. [¶] And the important thing that Huan tells us is Chris didn't even grab his phone until after the gunshots. Huan testified that he had his phone sitting on the chair. And after the gunshots, when Chris is running out, he grabs the phone on the way out. So it's not like Chris came in, grabbed the phone and now we have gunshots. That happened after. . . . [¶] And there were no weapons. So if you're coming in to rob somebody, you don't know what's going to be in the garage, you're at least going to bring some sort of weapon in. You're all three going to come in. [¶] That's not how this went down. That's not what happened here. And all of the witnesses, Huan, Samir, and Chris say that. This was not a robbery. [¶] And [defense counsel] says that well, 1/32nd of an ounce wouldn't matter to somebody. You know what, that's 40 bucks. That's $40 of marijuana. To some people, $40 is a significant amount. It's $40 of marijuana that he bought, that he was entitled to. He paid for that. He

21

wanted what he paid for. [¶] And I'm sure he was pissed that not only was he cheated out of that $40, but he was cheated. So this $40 is significant to a lot of people."

Contrary to defendant's argument, the prosecutor's argument that the taking of the cell phone could not support a claim of self defense was not a misstatement of the law. It was argument based on a reasonable interpretation of the evidence at trial. Likewise, contrary to defendant's argument, the argument does not "imply[] that Osana's attempt to recover the missing marijuana, even by force, would not be robbery" or that Saga could assert a "claim of right" to the money or marijuana as a defense to robbery. As noted above, the jury was properly instructed that the killing may be justified if, among other things, defendant reasonably believed that he was in imminent danger of being robbed. Nothing in the prosecutor's closing argument misstated or misled the jury with respect to the applicable law.

C. *The prosecutor did not improperly reference facts outside the record or misstate the facts in evidence.*

Defendant argues the prosecutor improperly referenced facts outside the record and misstated some facts in evidence. Specifically, he faults the prosecutor for suggesting, without supporting testimony by an expert witness, that the downward angle that the bullet traveled through Saga's body shows that he was ducking when he was shot. He also insists counsel should have objected to the prosecutor's claim that defendant "slowly" raised his gun up and aimed it at Saga before firing it, "when all of the evidence in the record indicated that appellant had simply drawn his gun and fired it." Finally, defendant objects to the prosecutor's speculation that defendant "could have shot Osana while chasing him out the door" or that he "could have fired at Chris first and then ran after Osana to shoot him," whereas the pathologist testified that Saga had been shot in the chest, not the back and no witness testified that defendant chased anyone.

The prosecutor's argument that Saga may have been ducking when defendant shot him is within the bounds of permissible argument and expert testimony was not necessary to support such an argument. (*People v. Beivelman* (1968) 70 Cal.2d 60, 76-77 [" ' "The right of counsel to discuss the merits of a case, both as to the law and facts, is very wide,

22

and he has the right to state fully his views as to what the evidence shows, and as to the conclusions to be fairly drawn therefrom." ' "]; *People v. Bolton* (1979) 23 Cal.3d 208, 212 [All reasonable inferences from evidence on the record may be presented in closing argument.].)

Defendant is correct that there was no testimony supporting the argument that defendant "slowly" positioned the gun before firing or that he chased the victim before firing. Nonetheless, the prosecutor did not suggest that there was any testimony or other evidence of how quickly or slowly defendant raised his arm, and his comments concerning the possibility of a chase plainly were speculation on his part. The jury was instructed per CALCRIM No. 222: "You must decide what the facts are in this case. You must use only the evidence that was presented in this courtroom. 'Evidence' is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence. [¶] Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence." Because the evidence was fairly consistent regarding the manner in which defendant held and fired the gun, there is no likelihood the jury would have adopted the prosecutor's statements as evidence.

D.      *The prosecutor did not incorrectly represent the terms of the immunity agreement to the jury.*

Defendant argues the prosecutor incorrectly and without evidentiary support told the jury that Hudieb was given immunity because he could have been prosecuted for selling marijuana, and that Hudieb would not have testified and would have asserted his Fifth Amendment privilege unless he had been given immunity. Defendant notes that the immunity given Hudieb included not just immunity from prosecution for a drug offense, but immunity from prosecution for all offenses other than perjury, including aiding and abetting murder. The prosecution, however, was under no obligation to detail for the jury every potential crime for which Hudieb might have been charged. The record shows that the prosecutor offered Hudieb use-immunity two weeks prior to trial. It is a reasonable

23

inference under the circumstances that Hudieb would not have testified without immunity. Accordingly, the prosecutor's argument was fair comment on the evidence.

E. *The prosecutor did not commit Brady*[10] *error.*

"In *Brady*, the United States Supreme Court held 'that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' [Citation.] . . . [E]vidence is material ' "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." ' [Citation.] . . . [¶] . . . There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' [Citation.] Prejudice, in this context, focuses on 'the materiality of the evidence to the issue of guilt and innocence.' [Citations.] Materiality, in turn, requires more than a showing that the suppressed evidence would have been admissible [citation], that the absence of the suppressed evidence made conviction 'more likely' [citation], or that using the suppressed evidence to discredit a witness's testimony 'might have changed the outcome of the trial.' " (*People v. Salazar* (2005) 35 Cal.4th 1031, 1042-1043.)

Here, prior to trial defense counsel asked the court to order the People to disclose all of the victim's prior convictions for violence, and the prosecutor stated that it had given the evidence to the defense, including the evidence of the victim's 2003 conviction under section 245, subdivision (a)(2). The court indicated that the conviction was in Alameda County and stated that it intended to get the file and familiarize itself with the facts prior to making a ruling on the admissibility of the prior conviction. Ultimately, the trial court admitted the character evidence and read the parties' stipulation to the jury: "On May 16th, 2003, Osana Saga pointed a handgun at a person in the city of Hayward. Mr. Saga did not fire the handgun and did not strike anyone with the handgun."

---

[10] *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).

Defendant contends the prosecutor committed *Brady* error by not disclosing to the defense further details of the conviction. Defendant's habeas petition alleges, "Present counsel had an attorney in their office examine the criminal case records in Alameda County and found that on December 2, 2003, Osana had indeed been convicted of assault with a firearm, section 245(a)(2), in case no. H34844B. The public portion of the file *also* indicated, however, that Osana had been sentenced to 4 years in prison, that the charges had arisen out of the attempted robbery of a liquor store, that Osana had been arrested and charged with assault with force likely to commit great bodily injury, Penal Code section 245(a)(4), and attempted second degree robbery, Penal Code section 211, and that Osana had committed these acts with an accomplice who was also charged with Penal Code section 245(a)(1), assault with a deadly weapon other than a firearm. [¶] The non-public portion of the file was obtained through motion. The reported facts were as follows: On May 16, 2003, an Alameda County Sheriff's Deputy went to Hank's Liquor Store in Hayward in response to a silent alarm and interviewed Dalbir Kaur, a woman in her late 40s, and Harinder Padda, a man in his twenties. The two were owners of the store and were working as clerks. Kaur was 'visibly upset and was crying and occasionally wailing in a loud voice.' Padda, a man in his twenties, 'had an abrasion to his left temple area and was bleeding from his nose.' They made the following statements to the police: [¶] 'On 051603, about 8:44 am, I was at work sitting near the cash register at Hank's Liquor. I heard my mom, Kaur Dalbir, start screaming. I stood up and saw a hispanic male grab my mom by her hair and start pulling and dragging her. That guy looked like he was holding a small hand gun in his right hand. There was a second guy who was hispanic that walked towards me and grabbed at me. We started fighting, and fell to the floor near the cash register. He punched me with both fists over five times. He also picked up a plastic baton that we keep behind the register and hit me at least three times with it, and then ran out of the store with the first guy. I followed them into the parking lot and saw them get into a white Cougar with a black top, with a partial plate VXX. They did not get any money or property while in the store. I did not hear the hispanic guys say anything while in the store. I recognized the guy who attached me as a customer

25

that has shopped in our store in the past. I can recognize both guys if seen again. I got some small scratches on my face but I do not need any medical attention. When I followed them outside the guy who attacked my mom pointed the small gun at me. I backed away and went back into the store. The first guy was wearing a black hooded jacket and blue jeans. The guy who attached me was wearing a black jacket. This is a true statement.' [¶] 'On 051603, about 8:44 am, I was at work stacking shelves at Hank's liquor. I am one of the owners of the store. I was bending down putting items on the shelf when I was grabbed from behind by an unknown person. He did not say anything to me. He pulled me by my hair and dragged me about 20 feet through the store. I did not know what was happening. I was so frightened that I urinated in my pants. He pulled me over near the cash register area and held me down. He held me for several seconds and then ran out of the store. I did not see the person who grabbed me very well. I do not know if I can identify the person if seen again. My head hurts where my hair was pulled, but I do not want or need medical treatment. This is a true statement. [¶] The guy who attacked my son came into the store about 7:30 am and asked if he could cash a check, but he left without doing so. I can recognize him if seen again.' "

The prosecution satisfied its responsibility by disclosing the existence of the victim's conviction. As the defendant has demonstrated, the details of Saga's conviction were available to the defense in the court file. (*People v. Morrison* (2004) 34 Cal.4th 698, 715.)

F. *The prosecutor did not misrepresent Saga's criminal history.*

Defendant contends the prosecutor committed misconduct by stating in closing argument that although Saga had a conviction for pointing a gun at someone in 2003, there was "nothing from 2004, 2005, 2006, 2007, 2008, 2009, 2010. So it's something you can consider. But it's not, like, you know, every year this guy is committing a violent crime against someone." He argues that the prosecutor knew this argument was false and misleading because the prosecutor must have known that in 2003 defendant was sentenced to prison for four years and thus was not free to commit other violent crimes during at least part of that period. Contrary to defendant's suggestion, the record does not

establish what the prosecutor knew about the duration of defendant's incarceration. Moreover, his statement remains true that Saga, whether or not incarcerated, did not have a record of violent criminal convictions occurring after 2003. There was no misconduct in this respect.

G. *The prosecutor did not prejudicially appeal to the jury's passion and prejudice.*

Defendant contends the prosecutor committed misconduct by improperly appealing to the prejudice of the jurors and by urging them to solve larger social problems by convicting defendant. Defendant argues that the italicized portion of the following argument includes an improper appeal for sympathy for Saga: "Another important guideline is that sympathy may not influence your decisions. Right? You can't consider sympathy or, on the other hand prejudice. Ironically, . . . in a murder case, there's usually more sympathy for the defendant than for the victim. [¶] I know that sounds odd. I guess it's because you don't get to see the victim. He doesn't come here and testify. You see the defendant who's dressed, you know, in normal civilian clothing, who's in . . . a secure courtroom with a deputy sheriff, who's well behaved . . . . [¶] So you don't see the defendant that the victim saw on August 29th, 2010. And then you add to that that if a mother testifies, you know, that's going to be sympathetic for you. I understand you're all human here. And those things can kind of play on your sympathy for the defendant. [¶] The fact that the defendant after he was caught, right, was scared and cried a little . . . . [¶] . . . [¶] Sort of the flip side of that is imagine if the facts were that this was an attempted murder case and Osana had survived. Say the gunshot went through his chest and hit his spine and he comes up and testified. You wouldn't be able to consider that. [¶] And that would be powerful. *I mean, to talk about how he can't play with his three young sons outside any more or make love to his wife, I mean, that could really pull at your heart strings. But you wouldn't be able to consider that. You wouldn't be able to consider that sympathy.* [¶] So I just say that on either side, when you go back to deliberate, if you feel sympathetic in any way, I understand you're human, but you can't let that affect your verdict." (Italics added.) Defendant argues that the use of such a rhetorical technique to suggest the opposite of what is literally stated is misconduct

because Saga's family is irrelevant to the proceedings and the only purpose for offering such evidence would have been to impermissibly generate sympathy for his family and prejudice against defendant. We disagree. When read in context of the surrounding argument, it does not appear that the prosecutor was intending to improperly influence the jury. Nor would the passions of reasonable jury been inflamed by the argument.

Defendant also faults the prosecutor for making repeated references to the larger social problems of drug dealing. The prosecutor stated, "Drug dealing is a dirty business. Drug dealers kill each other. They get in disputes with customers. It is a dirty business. [¶] And so it's not uncommon for a drug dealer to have a gun on him. And he has that gun on him so he's ready for a dispute. If any dispute happens, he's — no matter how big the person or how small the person is, he's got a gun, a loaded gun." The prosecutor also argued that "the problem of putting the gun in the hand of a drug dealer. No matter how big the guy is who confronts them, in their mind, they're bigger, they got a gun." Contrary to defendant's argument, the jury would not reasonably have understood the prosecutor's references to "drug dealers" with "guns" as a suggestion that the jury should address the problem of drug dealing generally by convicting defendant. The prosecutor said nothing about sending a message to drug dealers who carry guns; his argument was directed only to what the defendant in this case must have been thinking in arming himself with the gun.

Finally, defendant contends the following argument was intended to flame the jury's passions: "[W]hen [a shooting] happens for a drug dealer who's selling his drugs on the street corner because he doesn't have the luxury of having a garage to sell out of, it's second degree murder. [¶] The fact that this defendant was given a lot of luxuries in life that young men who often sell drugs aren't and gets to sell it out of his mother's garage, does not entitle him to better treatment under the law." This argument was made in rebuttal and related back to the defense argument about the rules that apply when considering self defense of a home. There was no misconduct. The argument did not imply that defendant should be punished because of his "comparative wealth."

28

5.      *Defendant did not receive ineffective assistance of counsel.*

Defendant contends he received ineffective assistance of counsel in two respects. First, he faults his trial counsel for failing to reasonably investigate Saga's criminal history and thereby uncover details of Saga's 2003 conviction, as well as other exculpatory information about Saga's violent history, including that defendant's brother believed Saga "had had a reputation in Hayward for beating up people and robbing them for money." Defendant's habeas petition alleges that defendant's brother told counsel that he had been willing to testify as a witness about Osana's reputation, but that defense counsel didn't want to call him as a witness. The record does not reflect what investigation if any, defense counsel conducted and what reasons, if any, defense counsel had for not calling defendant's brother testify.[11] We need not consider whether counsel's performance was deficient because any error was not prejudicial.

The probative value of the additional evidence identified by defendant was relatively minimal. The credibility of defendant's brother was severely diminished by the evidence that he and defendant discussed inducing Huan to lie about the victim's having a gun and his possible involvement in attempts to discredit or intimidate Hudieb. While the details of Saga's prior conviction support defendant's claim that Saga had a propensity for violence, the undisputed evidence established that Saga initiated the assault on defendant. Although there was significant dispute regarding the extent of the physical assault, there is no dispute that it was initiated by Saga without provocation by defendant. Despite this undisputed evidence, the jury rejected defendant's claim of self-defense, both complete and imperfect. There is no reason to believe that additional

---

[11] In his habeas petition, defendant alleges: "On August 1, 2014, counsel for petitioner sent a letter to defense counsel containing a series of questions about whether he had any tactical reasons for various actions he took or failed to take in his investigation of the case and at trial. . . . On or about September 23, 2014, defense counsel spoke with counsel Robert Beles and acknowledged that he had received the letter, but offered no reasons for the acts and omissions described in the letter." The August letter, however, is addressed almost exclusively to counsel's failure to object to the alleged prosecutorial misconduct and does not specifically address this issue.

29

evidence concerning Saga's propensity for violence would have resulted in a more favorable outcome for defendant.

Defendant also contends trial counsel prejudicially misstated the basic law of homicide in his own closing argument. He argues, "In his own closing argument, defense counsel did not appear to be familiar with the basic law of homicide. He repeatedly made gross mistakes that the prosecutor promptly, and correctly, objected to. He repeatedly insisted that second degree murder required a showing of intent to kill, attempted to back pedal by arguing that what he meant was that, since petitioner wasn't 'shooting randomly in the garage for no reason,' he either intended to kill or was shooting in self defense, but then returned to his erroneous argument that second degree murder required an intent to kill. Of course, it does not – petitioner, in theory, could have fired his gun with conscious disregard for human life, but intending only to scare or wound Osana, and would then have been guilty of second degree murder. Second degree murder requires only a finding of malice, not an intent to kill. [¶] Defense counsel also argued that to find murder, the jury would have to believe that defendant was 'completely unafraid' and 'wasn't scared.' This was an obvious misunderstanding of the law of self defense that again the prosecutor promptly, and correctly, objected to. Petitioner could have been 'scared' and not acted in self defense, as self-defense requires the defendant to be 'scared' of a particular thing – imminent robbery or imminent infliction of great bodily injury if he does not defend himself."

We disagree with defendant that counsel misstated the law. A fuller reading of the closing arguments establish that defense counsel did not ignore that "conscious disregard for human life" could support a conviction for second degree murder or argue that defendant could not be afraid and still commit second degree murder. Rather, counsel was arguing how he believed the law should be applied to the facts of this case. His argument was, in general terms, that defendant shot at Saga (either to kill him or to scare him) because he was surprised and provoked (heat of passion) or afraid (self-defense) in which case he was either not guilty or guilty only of manslaughter. Defense counsel argued to the jury that "to convict defendant of murder, you must believe that he wasn't

30

afraid, in fear of great bodily injury, had no reason to fear that with two huge men in his house. [¶] But on the other hand, when confronted with this, all of a sudden, with no warning, he didn't react suddenly, he was contemplative. And he decided when faced with this, holy cow, I've got two giant men in my house, they're all mad at me, things are getting physical, but I'm calm, I'll just kill one of them." Obviously there are nuances missing from this argument, but we cannot say, as defendant suggests, that trial counsel's argument "shows that [trial counsel] undertook the defense of a murder case where petitioner's main defense was self-defense, without being familiar with the basic law of either homicide or self defense and without familiarizing himself with such law before the trial." Nor did the prosecutor's objections and rebuttal argument, in which he emphasized that second degree murder did not require an intent to kill, make "it appear that the jury could not rely on anything defense counsel said."[12]

## Disposition

The judgment is affirmed. The petition for habeas corpus is denied.

---

[12] In rebuttal, the prosecution argued, "What Mr. Bequette has done is he stood before you and he'll pick, like, one element and just say, 'Well that wasn't proved.' But there are other elements as well. . . . [¶] . . . [¶] The issue about intent to kill, when Mr. Bequette stood here and said second degree murder requires intent to kill, that is absolutely wrong. . . . [¶] Second degree murder, as long as someone does something that is intentional and inherently dangerous to human life, like shoot at a passing car, then that qualifies for second degree murder. You don't need an intent to kill. [¶] The reason why I asked the defendant on the stand whether he intended to kill was to show that he didn't need to kill. To show that he knew in his mind whatever the distance was, that he was at a safe enough distance to pull out the gun and fully extend it and not have to kill . . . ."

                        _____

                        Pollak, Acting P.J.

We concur:


_____

Siggins, J.


_____

Jenkins, J.